IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH SOMORA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-0868-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Elizabeth Somora seeks review of the final decision of the Commissioner of
Social Security denying plaintiff's application for disability benefits under Title XVI of the
Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's
triangular fibrocartilage tear is not a severe impairment, (2) improperly determining
plaintiff's residual functional capacity, and (3) finding plaintiff not credible based on her
daily activities and conservative treatment. I find that the substantial evidence in the record as
a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion
for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.  BACKGROUND

On August 13, 2009, plaintiff applied for disability benefits alleging that she had been
disabled since June 9, 2009. Plaintiff's disability stems from Hepatitis C, cirrhosis of the liver,
spasms, thyroid problems and asthma. Plaintiff's application was denied on November 16,
2009. On December 17, 2010, a hearing was held before an Administrative Law Judge. On
December 23, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the
Act. On July 28, 2011, the Appeals Council denied plaintiff's request for review. Therefore,
the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Jerry Beltramo, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1971 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1971 | $ 227.20 | 1991 | $ 0.00 |
| 1972 | 253.00 | 1992 | 0.00 |
| 1973 | 480.67 | 1993 | 0.00 |
| 1974 | 0.00 | 1994 | 0.00 |
| 1975 | 0.00 | 1995 | 0.00 |
| 1976 | 0.00 | 1996 | 0.00 |
| 1977 | 0.00 | 1997 | 2,799.58 |
| 1978 | 128.53 | 1998 | 5,155.83 |
| 1979 | 2,101.14 | 1999 | 7,640.73 |
| 1980 | 3,021.82 | 2000 | 10,999.69 |
| 1981 | 3,308.27 | 2001 | 11,423.86 |
| 1982 | 3,912.70 | 2002 | 7,767.56 |
| 1983 | 3,037.91 | 2003 | 9,288.12 |
| 1984 | 807.23 | 2004 | 0.00 |
| 1985 | 0.00 | 2005 | 0.00 |
| 1986 | 0.00 | 2006 | 0.00 |
| 1987 | 0.00 | 2007 | 0.00 |
| 1988 | 0.00 | 2008 | 0.00 |
| 1989 | 0.00 | 2009 | 0.00 |
| 1990 | 0.00 | 2010 | 0.00 |

(Tr. at 106-116).

4

**Disability Report - Adult**

In this undated report plaintiff stated that she is 5'5" tall and weighs 232 pounds (Tr. at 117). She has a medical assistance card (Tr. at 117). When asked for the illnesses, injuries, or conditions that limit her ability to work, plaintiff wrote, "Hep c and cirrhosis of the liver spasms, thyroid problems, asthma" (Tr. at 118). She listed no symptoms of Hepatitis C which prevent her from working, only that no one will hire her once learning that she has that condition (Tr. at 118). When asked when and why she stopped working, she wrote "12/07/2003" and "I got sick" (Tr. at 118).

**Disability Report - Field Office**

On August 28, 2009, plaintiff met face-to-face with an interviewer in connection with her application for disability benefits. The interviewer observed that plaintiff had no difficulty with breathing, understanding, coherency, concentrating, answering, sitting, standing, walking, using her hands or writing (Tr. at 126).

**Function Report - Adult**

In Function Reports dated October 9, 2009, and October 21, 2009, plaintiff reported that her day consists of the following:

> Take my medicine, change clothes, get something to eat, AM & dinner, watch TV from 11 A - 4:30 P, take shower, sometimes get mail, makes sure room mate takes his medicine. Days I have to go to hospital to see Dr. & X Rays & labs 7 tests I go to Truman West.

(Tr. at 141, 152). Plaintiff reported that she goes to bed at 9:00 or 10:00 p.m. but does not get to sleep until after midnight or 1:00 a.m. (Tr. at 142, 153). She prepares her own meals once or twice every day; she does laundry, cleaning, and dishes without help; she goes outside every day by riding in a car or using public transportation; she is able to go out alone; and she shops for groceries (Tr. at 142-144, 154-155). She is able to read, watch television, do

Case 4:11-cv-00868-REL   Document 13   Filed 01/02/13   Page 5 of 31

puzzle books, and write letters "almost every day" (Tr. at 145, 156). She visits with people and she goes to church (Tr. at 145, 156).

When asked what abilities are affected by her condition, plaintiff wrote that she can lift less than five pounds, that squatting hurts her knees, that bending hurts her stomach, that walking for too long makes her hurt, and that kneeling hurts her knees (Tr. at 146, 157). She has no difficulty with standing, reaching, sitting, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, using her hands, or getting along with others (Tr. at 146, 157, 169). Plaintiff stated that she can walk about one block before needing to rest for ten to 15 minutes (Tr. at 146, 157). She is "very good" at finishing what she starts; she is "very good" at following written and verbal instructions (Tr. at 146-147, 157-158, 164-171).

## B. SUMMARY OF MEDICAL RECORDS

Plaintiff was diagnosed with Hepatitis C[1] in 2004 (Tr. at 216).

On November 11, 2005, she was seen at Truman Medical Center for a liver biopsy (Tr. at 356-360). Later records indicate that the biopsy revealed cirrhosis[2] with grade 3

---

[1]Hepatitis C is an infection caused by a virus that attacks the liver and leads to inflammation. Most people infected with the Hepatitis C virus (HCV) have no symptoms. In fact, most people do not know they have the Hepatitis C infection until liver damage shows up, decades later, during routine medical tests. Hepatitis C infection usually produces no signs or symptoms during its earliest stages. When signs and symptoms do occur, they are generally mild and flu-like and may include fatigue, fever, nausea or poor appetite, muscle and joint pains, and tenderness in the area of the liver. http://www.mayoclinic.com/health/hepatitis-c/DS00097

[2]Cirrhosis is scarring of the liver. Your liver is a large organ that is located in your upper abdomen. The liver carries out several essential functions, such as detoxifying harmful substances in your body, purifying your blood and manufacturing vital nutrients. Cirrhosis occurs in response to chronic damage to your liver. With mild cirrhosis, your liver can repair itself and continue to do its job. But with more advanced cirrhosis, more and more scar tissue forms in the liver, making it impossible to function adequately. Cirrhosis often has no signs or symptoms until liver damage is extensive. When signs and symptoms do occur, they may include fatigue, bleeding easily, easy bruising, fluid accumulation in your abdomen, loss of appetite, nausea, swelling in your legs, and weight loss. http://www.mayoclinic.com/health/cirrhosis/DS00373

Case 4:11-cv-00868-REL   Document 13   Filed 01/02/13   Page 6 of 31

inflammation (Tr. at 295). (These medical records were presented only to the Appeals Council, not to the ALJ).

On December 28, 2005, plaintiff saw medical student Kim Waterhouse, concerned about an ear infection and "her new diagnosis of Hep C," but voicing no other complaints (Tr. at 346). (This medical record was presented to the Appeals Council, not to the ALJ).

Plaintiff started treatment for Hepatitis C in 2006 but treatment had to be stopped after four months because her blood platelet count dropped too low (Tr. at 216). Plaintiff continued to undergo routine monitoring for her condition (Tr. at 295).

On August 2, 2008, plaintiff saw Jared Keeler, M.D., at Truman Medical Center, stating that she had been "doing fairly well" but had lesions on her arm, and back pain which was relieved by Tylenol (Tr. at 258-259). Dr. Keeler diagnosed dermatitis; controlled hypertension; controlled and asymptomatic hypothyroidism; and Hepatitis with stable liver function (Tr. at 260). Plaintiff was told to return in six months.

On December 17, 2008, plaintiff saw Nancy Todd, A.P.N., at Truman Medical Center, for a routine Hepatitis C follow up (Tr. at 249). Plaintiff reported that overall she felt "very well" (Tr. at 250). She denied fatigue but reported generalized arthralgia (joint pain), more so in her knees (Tr. at 250). Laboratory results were unremarkable, and on physical exam Ms. Todd observed that plaintiff could move all of her extremities well (Tr. at 249-250). Plaintiff's medications were continued and she was scheduled for an upper endoscopy,[3]

---

[3]An upper endoscopy is a procedure used to visually examine the upper digestive system with a tiny camera on the end of a long, flexible tube. A specialist in diseases of the digestive system (gastroenterologist) uses endoscopy to diagnose conditions that affect the esophagus, stomach and beginning of the small intestine (duodenum). The medical term for an upper endoscopy is esophagogastroduodenoscopy. An upper endoscopy may be done in a doctor's office, an outpatient surgery center or a hospital.
http://www.mayoclinic.com/health/endoscopy/MY00138

Case 4:11-cv-00868-REL   Document 13   Filed 01/02/13   Page 7 of 31

colonoscopy,[4] and abdominal ultrasound (Tr. at 251). She was told to return in six months (Tr. at 251).

On January 12, 2009, plaintiff underwent an abdominal ultrasound that revealed a right hepatic cyst,[5] unchanged from the prior examination, and mild splenomegaly,[6] but the examination was otherwise unremarkable (Tr. at 247-248).

On February 5, 2009, plaintiff underwent an evaluation at Concerta Medical Center in connection with her case with the Missouri Division of Family Services (Tr. at 377). (This record was not presented to the ALJ). She reported chronic Hepatitis C and cirrhosis of the liver. She also reported that she had been fired from her last job (as a pizza delivery person) in 2004. Craig Lofgreen, M.D., wrote:

> This is an obese lady who appears approximately her stated age of 53 years. Her vital signs are normal. She performs an antalgic[7] and somewhat dysrhythmic lumbosacral range of motion and transfers with complaints of low back pain. She can reach overhead without difficulty and the gait appears normal. HEENT [head, eyes, ears, nose, throat], cardiopulmonary exam unremarkable. The abdomen is obese, but otherwise free of mass. The patient smells of urine.

---

[4]A colonoscopy is an exam used to detect changes or abnormalities in the large intestine (colon) and rectum. During a colonoscopy, a long, flexible tube (colonoscope) is inserted into the rectum. A tiny video camera at the tip of the tube allows the doctor to view the inside of the entire colon. If necessary, polyps or other types of abnormal tissue can be removed through the scope during a colonoscopy. Tissue samples (biopsies) can be taken during a colonoscopy as well. http://www.mayoclinic.com/health/colonoscopy/my00621

[5]Cystic lesions of the liver are common and usually benign. The most frequent lesion is simple hepatic cyst: typical imaging findings make their diagnosis easy and they require no treatment. Asymptomatic hepatic cysts do not require any treatment or follow-up. http://www.ncbi.nlm.nih.gov/pubmed/18772728

[6]Your spleen is a small organ located just below your rib cage on your left side. Normally, your spleen is about the size of a fist, but a number of conditions -- from infections to liver disease and some cancers -- can cause an enlarged spleen, also known as splenomegaly. Most people do not have symptoms with an enlarged spleen. An enlarged spleen may cause no symptoms, pain or fullness in the left upper abdomen that may spread to the left shoulder, feeling full without eating or after eating only a small amount (this can occur when an enlarged spleen presses on the stomach), anemia, fatigue, frequent infections, easy bleeding. http://www.mayoclinic.com/health/enlarged-spleen/DS00871

[7]Counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain.

8

The patient's unstable work history and deficient personal hygiene may suggest functional issues. Her exam is otherwise remarkable for obesity and an otherwise non-compelling picture. The significance of her history as regards to her functional capabilities is unclear, however, patients who, in fact, do suffer from cirrhosis of the liver characteristically lack endurance and suffer from fatigue. Chemistry profile is pending. Considering her examination findings and the fact that she has not worked for several years, it appears the prognosis for the patient re-involving herself in vocational activity is poor. It does, however, appear based on physical examination findings that she could stand or walk for up to 2 hours per day and that she does have normal use of the upper extremities.

(Tr. at 377). The day before, she completed a questionnaire indicating that she has no decreased function in either hand and she denied back pain and sleep disorders (Tr. at 380). (The records from Concerta Medical Center were presented to the Appeals Council, not to the ALJ).

On February 12, 2009, plaintiff saw Farihan Shafi, M.D., for a routine six-month follow up for lab results and medication refills (Tr. at 240). Plaintiff reported that her asthma and seasonal allergies were controlled by medication, but she requested diet pills to help her lose weight. Dr. Shafi diagnosed controlled hypertension, asymptomatic hypothyroidism, Hepatitis with stable liver function, and asthma. He continued plaintiff's medications which included Popranolol for hypertension, Macrobid for a urinary infection, Levothyroxine for hypothyroidism, topical cream for dermatitis, and Albuterol and Avar for asthma.

On February 27, 2009, plaintiff underwent a renal/bladder ultrasound at Truman Medical Center; the ultrasound was normal (Tr. at 238).

On March 18 2009, plaintiff saw Reid Smith, M.D., at Truman Medical Center with complaints of arthritis in her fingers and right knee and occasional swelling in her joints (Tr. at 233-234). Plaintiff said the pain was relieved well by Tylenol and "does not affect her daily activities and [she] is able to move her fingers without any problem." Dr. Smith noted that plaintiff's hypertension and hypothyroidism were controlled on medications and her liver function tests were stable. He advised plaintiff to return in three months.

9

On April 16, 2009, plaintiff underwent a colonoscopy performed by Stuart Chen, M.D., and had some polyps removed (Tr. at 227-228). Dr. Chen performed a barium enema[8] the following month and assessed diverticulosis without evidence of diverticulitis[9] (Tr. at 226).

June 9, 2009, is plaintiff's alleged onset date.

On June 15, 2009, plaintiff saw Nancy Todd, A.P.N., at Truman Medical Center for a follow-up appointment (Tr. at 216-218). Plaintiff said she felt well and had "minimal complaints," mainly about symptoms of arthritis. She specifically denied any nausea or fatigue and said her appetite was good. On exam, Ms. Todd noted that plaintiff was able to move all extremities well and had a steady gait. She assessed Hepatitis, gastritis[10] and esophageal varices.[11] At that time, plaintiff was taking Loratadine (treats allergies), Levothyroxine (for thyroid), and Popranolol (for hypertension) (Tr. at 216). Four days later,

---

[8] A barium enema is a special x-ray exam used to detect changes or abnormalities in the large intestine (colon). http://www.mayoclinic.com/health/barium-enema/MY00619

[9] Diverticula are small, bulging pouches that can form anywhere in the digestive system, including the esophagus, stomach and small intestine, but are most commonly found in the large intestine. Diverticula are common, especially after age 40. The presence of diverticula is known as diverticulosis. "You may never even know you have these pouches because they seldom cause any problems, such as diverticulitis" which occurs when one or more diverticula in the digestive tract become inflamed or infected. http://www.mayoclinic.com/health/diverticulitis/DS00070

[10] Gastritis describes a group of conditions with one thing in common: inflammation of the lining of the stomach. The inflammation of gastritis is often the result of infection with the same bacterium that causes most stomach ulcers. However, other factors -- such as injury, regular use of certain pain relievers or drinking too much alcohol -- also can contribute to gastritis. Gastritis may occur suddenly (acute gastritis) or it can occur slowly over time (chronic gastritis). In some cases, gastritis can lead to ulcers and an increased risk of stomach cancer. For most people, however, gastritis is not serious and improves quickly with treatment. http://www.mayoclinic.com/health/gastritis/DS00488

[11] Esophageal varices are abnormal, enlarged veins in the lower part of the esophagus -- the tube that connects the throat and stomach. Esophageal varices occur most often in people with serious liver diseases. Esophageal varices develop when normal blood flow to the liver is slowed. The blood then backs up into nearby smaller blood vessels, such as those in the esophagus, causing the vessels to swell.

on June 19, 2009, plaintiff had an abdominal ultrasound which showed a small right hepatic lobe lesion that appeared to be stable (Tr. at 214-215). On July 8, 2009, Ms. Todd contacted plaintiff to advise her of test results showing that her Hepatitis C had relapsed, and she was encourage to keep all of her follow-up appointments (Tr. at 219).

On August 13, 2009, plaintiff filed her application for disability benefits.[12]

On August 17, 2009, plaintiff saw Richard Butin, M.D., for a follow-up at Truman Medical Center (Tr. at 207-211). She complained of hip and thigh pain, aggravated by sitting for too long, and occasional numbness in her foot. Plaintiff reported a history of arthritis but had never tried anything for pain. She said she was taking all her medications as prescribed and requested refills. On exam Dr. Butin found that plaintiff had normal sensation and muscle strength in her lower extremities with no edema,[13] warmth or erythema,[14] though she did have mild pain on palpation and flexion of the knee, and her internal hip rotation was somewhat restricted by pain. X-rays of plaintiff's right hip were normal. Dr. Butin prescribed Flexeril (a muscle relaxer) and told plaintiff to use heating pads and start physical therapy for her right hip and thigh pain. He refilled her other medications.

On September 28, 2009, plaintiff saw Dr. Keeler at Truman Medical Center for a follow up on her hip and thigh pain (Tr. at 202-203). Plaintiff reported that her pain had improved with stretching exercises and rest, her fatigue had improved with medication, and she felt "much better" (Tr. at 202). She had not done physical therapy as she said she could

---

[12]Plaintiff's alleged onset date is June 9, 2009; however, she did not file her application for supplemental security income under Title XVI until August 13, 2009; therefore, the relevant time period for considering plaintiff's claim is August 13, 2009 (the date of her application) through December 23, 2010 (the date of the ALJ's decision).

[13]Edema is swelling caused by excess fluid trapped in the body's tissues. http://www.mayoclinic.com/health/edema/DS01035

[14]Redness of the skin caused by dilatation and congestion of the capillaries, often a sign of inflammation or infection. http://medical-dictionary.thefreedictionary.com/erythema

not afford it. She denied any fatigue or new complaints. Dr. Keeler performed a physical exam and observed that plaintiff had full muscle strength and range of motion. He continued plaintiff on her same medications and told her to continue using heating pads.

An abdominal ultrasound performed on November 30, 2009, revealed still-present liver lesions -- a mildly enlarging left and a stable right lesion (Tr. at 328). Gerald Finke, D.O., recommended an MRI for further characterization (Tr. at 329).

On December 16, 2009, plaintiff had an x-ray of her right wrist due to complaints of pain (Tr. at 327). The x-ray was normal, but she was instructed to follow up if the pain continued, and doctors would consider an MRI.

The following day, on December 17, 2009, plaintiff saw Laura Alba, M.D., at Truman Medical Center for a follow up on Hepatitis C and cirrhosis (Tr. at 323-324). Plaintiff continued to be asymptomatic and had not had alcohol since 1994. Dr. Alba discussed the possibility of a second attempt at treatment for Hepatitis and plaintiff agreed. Dr. Alba indicated she would schedule an upper endoscopy to assess esophageal varicies prior to making a decision to initiate treatment, and she ordered lab work.

Two days later, on December 19, 2009, plaintiff went to Truman Medical Center's ENT clinic for removal of a bug from her ear (Tr. at 322). Three weeks earlier, plaintiff had applied some hydroperoxide after a bug got in her ear. "[T]his obviously killed the bug, but she had difficulty to pull back out of her ear."

On January 19, 2010, plaintiff underwent an abdominal MRI that confirmed chronic liver disease (Tr. at 320-321). It was recommended that she return in four to six months for another ultrasound.

On February 17, 2010, plaintiff saw Dr. Chen at Truman Medical Center for an upper endoscopy which showed small, barely visible varices in the lower third esophagus and mild

diffuse inflammation in the antrum and duodenal bulb[15] (Tr. at 318-319).  He diagnosed gastritis and duodenitis.[16]

On March 1, 2010, plaintiff saw Dr. Keeler at Truman Medical Center reporting back pain which started four days earlier when she was doing laundry (Tr. at 315-317).  Plaintiff said her pain had been "getting better" but she still had trouble moving.  Plaintiff said she had tried Tramodol[17] but did not like taking it because it made her sleepy.  Dr. Keeler thought plaintiff's back pain was consistent with sciatica;[18] he prescribed prednisone[19] and Flexeril (muscle relaxer).

On May 3, 2010, plaintiff saw Peter Gochee, M.D., at the Truman Medical Center ENT clinic, complaining that she felt like she had a bug in her ear again (Tr. at 314).  "She is having some chronic rhinitis [hay fever] and periorbital edema [puffy eyes] consistent with

---

[15]



[16]Duodenitis is inflammation of the lining of the duodenum, the first part of the small intestine, just past the stomach.
http://www.uofmmedicalcenter.org/healthlibrary/Article/40530

[17]Also called Ultram, Tramodol is a narcotic-like pain reliever.

[18]"Sciatica refers to pain that radiates along the path of the sciatic nerve -- which branches from your lower back through your hips and buttocks and down each leg. Typically, sciatica affects only one side of your body.  Sciatica most commonly occurs when a herniated disk or a bone spur on the spine compresses part of the nerve. This causes inflammation, pain and often some numbness in the affected leg.  Although the pain associated with sciatica can be severe, most cases resolve with just conservative treatments in a few weeks. People who continue to have severe sciatica after six weeks of treatment might be helped by surgery to relieve the pressure on the nerve." http://www.mayoclinic.com/health/sciatica/DS00516

[19]A corticosteroids which prevents the release of substances in the body that cause inflammation.

Case 4:11-cv-00868-REL   Document 13   Filed 01/02/13   Page 13 of 31

known allergies. She is otherwise doing well." Dr. Gochee assessed cerumen impaction (ear wax) and chronic rhinitis and recommended saline irrigations and routine ear cleansing.

On June 3, 2010, plaintiff saw Wendell Clarkston, M.D., at Truman Medical Center for a follow up on Hepatitis (Tr. at 308-310). Dr. Clarkston indicated that plaintiff could begin combination therapy treatment for her Hepatitis.

On June 10, 2010, plaintiff underwent an examination at the Truman Medical Center Eye Clinic (Tr. at 304-307). Glasses were prescribed and she was told to return in one year.

On June 14, 2010, plaintiff saw Dr. Keeler at Truman Medical Center complaining of wrist pain and wanting to know whether she had arthritis (Tr. at 301-303). Dr. Keeler noted that the x-rays of plaintiff's wrists were "unrevealing" and ordered an MRI.

On June 29, 2010, plaintiff underwent an MRI of her right wrist (Tr. at 300). Dr. Jamoulis noted no osteochondral defects (damaged cartilage in the joint) but a triangular fibrocartilage tear through the ulnar component and scattered degenerative changes throughout the carpal bones (Tr. 300).

On July 8, 2010, plaintiff met with Dr. Alba for follow up of her Hepatitis (Tr. at 295-297). Plaintiff was in her fifth week of treatment, showing a positive rapid response, tolerating treatment well, and complaining of a little fatigue and occasional insomnia but "nothing significant." Dr. Alba continued plaintiff's treatment and ordered lab testing.

On July 22, 2010, plaintiff underwent an abdominal ultrasound which showed multiple lesions in the left hepatic lobe and a grossly stable right hepatic lobe cyst (Tr. at 293-294). Dr. Jamoulis recommended a repeat MRI for further evaluation.

On August 9, 2010, plaintiff saw Esmat Sadeddin, M.D., at Truman Medical Center for an upper endoscopy (Tr. at 289-292). Dr. Sadeddin diagnosed gastritis and noted non-bleeding esophageal varices.

14

On September 3, 2010, plaintiff saw Dr. Alba at the Truman Medical Center Gastrointestinal Clinic to follow up on Hepatitis after completing 15 weeks of a 48-week course of treatment (Tr. 286-288). Plaintiff denied any side effects other than some fatigue, and a review of systems was negative. Dr. Alba continued plaintiff's treatment and ordered an MRI to assess liver lesions, per Dr. Jamoulis's recommendation.

On September 7, 2010, plaintiff saw Tara Chettiar, M.D., at the Truman Medical Center obstetrics/gynecology clinic for an annual examination (Tr. at 282-284). Plaintiff said she had "no complaints." The examination was normal (Tr. 284).

On September 8, 2010, plaintiff saw Slawomir Walewicz, M.D., at Truman Medical Center, "primarily to get a doctor's note excusing her from jury duty," but also to follow up on "several medical problems" including Hepatitis, hypothyroidism, asthma, rhinitis, reflux, and right wrist pain (Tr. 278-281). Plaintiff said her right wrist "flares up every once in a while," adding that she was not taking any over-the-counter or other medications for pain. Dr. Walewicz referred plaintiff to an orthopedist. He also noted plaintiff's asymptomatic hypothyroidism and controlled reflux, rhinitis, and asthma. He continued plaintiff's Hepatitis treatment. He provided a jury excuse note and refilled plaintiff's medications.

On September 15, 2010, plaintiff had an eye examination at Truman Medical Center during which she denied any pain or problems (Tr. at 275-277). The examiner noted no issues and told plaintiff to return in three months.

On September 16, 2010, plaintiff saw Jeffrey Low, M.D., at the Truman Medical Center Orthopedic Clinic, complaining of intermittent right wrist pain for several months (Tr. at 269-274). That day, plaintiff reported her pain as 0 on a scale of 0 to 10 (Tr. 274). An MRI showed a tear of the triangular fibrocartilage. Upon examination, Dr. Low found that plaintiff had full range of motion in her wrist with no pain, no reproducible mechanical

Case 4:11-cv-00868-REL   Document 13   Filed 01/02/13   Page 15 of 31

symptoms, and only mild tenderness to palpation. Dr. Low recommended conservative treatment with a wrist splint.

That same day, September 16, 2010, plaintiff saw Dr. Alba at Truman Medical Center to follow up on her Hepatitis C (Tr. 271-274). She denied any pain or problems. Plaintiff had completed approximately 17 weeks of "combination treatment" with reduced dosages of medications due to neutropenia, or low white blood cell count. A review of systems was negative. Dr. Alba continued plaintiff's treatment, increasing her dosage of Pegasys and Ribaravin, both for treatment of Hepatitis C.

## C.   SUMMARY OF TESTIMONY

During the December 17, 2010, hearing, plaintiff testified; and Jerry Beltramo, a vocational expert, testified at the request of the ALJ.

### 1.   Plaintiff's testimony.

At the time of the hearing, plaintiff was 55 years of age and is currently 57 (Tr. at 27). She left school in 10th grade and then earned a GED (Tr. at 27). She lives alone[20] (Tr. at 29). Plaintiff normally does not get to sleep until 2:00 a.m. to 4:00 a.m. (Tr. at 30). Some of her medication causes her to have problems sleeping at night (Tr. at 30-31). Plaintiff usually gets up around 9:00 a.m., but the day before the hearing she slept until 2:00 in the afternoon (Tr. at 29-30). Plaintiff takes short naps during the day and about three times a week she naps for an hour or two during the day (Tr. at 31). She spends her day watching television, she uses

_____

[20]In plaintiff's application for disability benefits, which was completed before her testimony, she reported that she lived with Terry Wright, age 58, who owns or is buying the home where she lives (Tr. at 92). "The mortgage is $508.91 monthly. I do not make payments toward the household expenses. I am not receiving any food or shelter from the people I live with for which I have an agreement to repay. . . . I do not expect these arrangements to change." (Tr. at 92-93). In her motion to proceed in forma pauperis, which was completed after her testimony, plaintiff said that she lives "with a friend" who pays all of her bills (document number 1, page 6). The address listed on both of these documents was the same; therefore, it appears that, because the residence belonged to Terry Wright and not plaintiff, her testimony during her hearing about living alone may not have been truthful.

16

the microwave to fix meals, she sits on her bed and goes through things to get rid of, she attends church services three times a week, and she goes to the laundromat with a friend (Tr. at 30). Plaintiff does not dust or vacuum because she has no rugs in her house (Tr. at 30). She does not do dishes because her hot water tank went out (Tr. at 30).

Plaintiff last worked on December 7, 2003 (Tr. at 27). She wrote down truck numbers as they came in and went out (Tr. at 27). She left that job because her employers said they did not need her anymore (Tr. at 27). Plaintiff looked for work after she lost that job (Tr. at 27-28).

Plaintiff cannot work full time because of her Hepatitis C -- she lists that as a current medical condition and employers will not hire her because of it (Tr. at 28). Plaintiff began treatment for Hepatitis C in the past but did not complete it (Tr. at 28). She restarted treatment about seven months before the hearing (Tr. at 28). Plaintiff's Hepatitis C caused her to be fatigued and it makes her bones sore (Tr. at 28). She experiences bone pain in her legs about four times a week (Tr. at 29). Her treatment causes her to be nauseated sometimes, she loses her hair, she is "a little bit more" fatigued than she was before, and she experiences drowsiness (Tr. at 28).

Plaintiff has arthritis in her right hand (Tr. at 29). She has asthma, allergies, high blood pressure, and thyroid problems (Tr. at 31). Plaintiff's inhalers help her asthma but sometimes she has problems catching her breath (Tr. at 31-32). Plaintiff's high blood pressure and thyroid problems are controlled with medication (Tr. at 32).

2. **Vocational expert testimony.**

Vocational expert Jerry Beltramo testified at the request of the Administrative Law Judge. Plaintiff had substantial gainful activity from 2000 to 2003 (Tr. at 33). She worked as a pizza delivery driver and a maid at the Holiday Inn (Tr. at 33). The first hypothetical involved a person who could lift 20 pounds occasionally; stand, walk, and sit for six hours;

occasionally perform all postural positions except could never climb a ladder, rope or scaffold; and would need to avoid concentrated exposure to extreme heat or cold and environmental irritants (Tr. at 33). The vocational expert testified that such a person could perform plaintiff's past relevant work as a room attendant, or maid, which is an unskilled position with a light exertion level (Tr. at 33).

The second hypothetical was based on plaintiff's hearing testimony: That she experiences fatigue and leg pain four times a week, has difficulty manipulating her fingers on her right hand due to arthritis, and has difficulty writing her name with her right hand while being right-hand dominant, and that she needs to nap for a short period of time or up to an hour or two hours three times a week (Tr. at 34). The vocational expert testified that such a person could perform no job due to having to take naps for multiple hours (Tr. at 34).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Evelyn Gunn entered her opinion on December 23, 2010 (Tr. at 11-18).

Step one. Plaintiff has not engaged in substantial gainful activity since August 13, 2009, her application date (Tr. at 13).

Step two. Plaintiff has the following severe impairments: Hepatitis C and obesity (Tr. at 13). Plaintiff's hypothyroidism, hypertension and asthma are controlled by medications and are therefore non-severe (Tr. at 14). Plaintiff's alleged fatigue, arthralgias, and joint pain and swelling cause no more than minimal limitation in her ability to perform basic physical work activities and are therefore non-severe impairments "as there is little or no supportive medical evidence of record." (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four. Plaintiff retains the residual functional capacity to perform a range of light work, carrying and lifting 20 pounds occasionally; standing, walking or sitting for a total of six hours each per day (Tr. at 15). She can perform all postural positions occasionally, but she can never climb ropes, ladders or scaffolds and should avoid concentrated exposure to extreme heat or cold and environmental irritants (Tr. at 15). Plaintiff's allegations of disabling symptoms are not entirely credible (Tr. at 15-17). With her residual functional capacity, plaintiff is capable of performing her past relevant work as a room attendant (Tr. at 18).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining

Case 4:11-cv-00868-REL   Document 13   Filed 01/02/13   Page 19 of 31

credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The undersigned finds the claimant credible to the extent that she would experience some physical symptoms as a result of her impairments. Although the claimant's allegations of disabling impairments are not consistent with the record, . . . the undersigned accorded the claimant the benefit of the doubt and reduced the residual functional capacity to incorporate limitations from her alleged arthritis, respiratory difficulty, hepatitis, and obesity. Moreover, the undersigned cannot find the claimant's allegations that she is incapable of all work activity to be credible because of significant inconsistencies in the record as a whole. Overall, based on the totality of evidence, taking into consideration the claimant's complaints of fatigue, arthralgias, asthma and obesity, it would be likely she would experience some limitations, however, not to the degree she asserts. Further, no medical practitioner has opined she has a condition which would preclude all work. The claimant's allegations, including subjective complaints of pain, are not fully credible in light of her lack of medical treatment, the reports of treating and examining practitioners that show fairly normal examinations and mild or minimal findings on objective testing, her activity after her alleged disability, and her need for only mild or over the counter medications to control her symptoms. . . .
>
> Specifically, conservative medical treatment of the claimant's problems appears to often control mild to moderate symptoms. The claimant does not use an assistive device to get around. The claimant testified that over-the-counter Tylenol helps her knee and hand pain. Conservative measures were used successfully to treat her right hip and thigh pain. Progress notes from Truman Medical Center dated August 17,

20

2009, indicate the claimant stated that while she had some right hip and knee pain, she denied loss of sensation and muscle weakness. Examination of lower extremity musculoskeletal indicated normal sensation and muscle strength with no edema, warmth, or erythema. There was only slight crepitus and mild pain on palpation and flexion of the knee. Motor skills were 5/5 and it was observed that physical therapy and Flexeril had helped a little. The claimant's pain was noted to be alleviated well when she took Tylenol. She also reported on September 28, 2009, that her fatigue had been improved since starting Levothyroxine and she felt much better.

Subsequent progress notes from Truman Medical Center dated September 15, 2010, indicate the claimant had experienced right wrist pain several months earlier that had been intermittent, with catching and popping that occurred approximately once a day. An MRI found a tear of the triangular fibro cartilage, and X-rays indicated intercarpal arthritis. The claimant was provided a cock-up wrist splint to wear. An orthopedic examination revealed right wrist full range of motion without pain. There was only mild tenderness to palpation on the ulnar aspect of her wrist and mild tenderness to palpation of her distal radioulnar joint (DRUJ). The DRUJ was stable and she did not have any pain with hypersupination or with ulnar devastation. Additionally claimant's lungs were clear to auscultation bilaterally. Conditions that can be reasonably regulated by treatment cannot constitute a basis of disability. If an impairment can be controlled by treatment or medication, as noted above, it cannot be considered disabling. When an individual's impairment is improved by treatment or medication and that treatment or medication is prescribed and available, then only the limitations remaining after treatment are considered for disability purposes.

. . . The claimant indicated she has gained 60 pounds. In this case, the claimant has other physical impairments including hip, knee and foot pain, which are negatively impacted by her obesity. Considering the combined effect of the claimant's impairments, and pain in her hip and knees, she is limited to a range of light exertion work.

While the claimant alleges totally disabling physical conditions the claimant has engaged in activities after her alleged date of onset of disability. The claimant testified she lives by herself, fixes simple meals, attends church 3 days a week, does household chores including going to the laundromat. The claimant observed in a Function Report dated October 9, 2009, that she goes outside every day and uses public transportation. She handles her own financial matters, writes letters, works on puzzle books, and visits other people. The claimant also noted that she does not have any problem following written or spoken instructions, and she gets along real good with authority figures. The evidence of the claimant's daily activities after her alleged disability onset date indicates involvement of significant mental and physical activities. The evidence shows the claimant's daily activities demonstrate successful independent living, which is inconsistent with the claims of disabling impairments. This level of activity demonstrates a level of vigor and an ability to concentrate and interact with others, which is inconsistent with the claimant's claim that she is unable to perform any work.

In this case, the ALJ found that plaintiff's subjective complaints and alleged limitations

due to fatigue, arthralgias, asthma, and obesity were out of proportion to the other evidence of

record.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  For example, the ALJ properly

noted that no medical practitioner had found that plaintiff had a condition that would

preclude all work.  It is significant that no physician who examined plaintiff has found

limitations consistent with disability.  Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000)

(citing Brown v. Chater, 87 F.3d 963, 964-965 (8th Cir.1996) (lack of significant restrictions

imposed by treating physicians supported the ALJ's decision of no disability)).  In assessing

plaintiff's credibility, the ALJ also observed that plaintiff did not have the kind of medical

treatment one would expect for a completely disabled individual.  Treating and examining

physicians generally noted fairly normal examinations and mild or minimal findings on

objective testing.  Moreover, plaintiff took only mild or over-the-counter medications to

control her symptoms.  These medications effectively controlled her occasional pain, further

supporting the ALJ's finding that plaintiff is not disabled.  "If an impairment can be controlled

by treatment or medication, it cannot be considered disabling."  Brown v. Astrue, 611 F.3d

941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009));

Loving v. Dept. of Health & Human Services, 16 F.3d 967, 971 (8th Cir. 1994) (treatment

consisting of over-the-counter medication is inconsistent with complaints of disabling pain).

The ALJ noted that conservative medical treatment generally controlled plaintiff's symptoms.

A pattern of conservative medical treatment is a proper factor for an ALJ to consider in

evaluating a claimant's credibility.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (citing

Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

Plaintiff often reported to her treating physicians that she "felt fine" or was "doing

well" and had minimal or "no complaints," which is inconsistent with her alleged inability to

work.

Medical records show that plaintiff tolerated the second course of Hepatitis treatment

well with minimal side effects such as a "little fatigue" and occasional insomnia.  The ALJ

22

properly found that plaintiff's treatment was "conservative."

In assessing plaintiff's credibility, the ALJ observed that plaintiff continued to engage in a number of activities that were inconsistent with an alleged inability to work in any capacity. Plaintiff was able to attend church three days each week, go outside every day, use public transportation, write letters, work on puzzle books, visit people, prepare meals, live independently,[21] and handle her own finances. As the ALJ noted, this level of activity demonstrates a level of vigor and an ability to concentrate and interact with others that is inconsistent with plaintiff's claimed inability to work in any capacity.

Plaintiff argues that her ability to continue some activities of daily living in no way directs a finding that she can engage in light work. However, the ALJ did not state that plaintiff's daily activities direct a finding that she can engage in light work. The ALJ stated that her level of activities called into question the credibility of her subjective statements. The Eighth Circuit has repeatedly held that it is proper for an ALJ to consider a claimant's daily activities when evaluating the credibility of subjective claims. Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Plaintiff relies on Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000), to support her argument that the ALJ improperly discredited her subjective complaints of pain. Unlike plaintiff, however, the claimant in Singh consistently and repeatedly sought treatment and tried pain medications, chiropractic care, a TENS unit, several rounds of diagnostic testing, and even surgery, and stated that he was unable to shave without assistance or sit through an entire movie. Id. at 453. In contrast, plaintiff did not try numerous prescription pain medications, physical therapy, or surgery, nor did she claim that pain significantly interfered

―――――――――――

[21]Although plaintiff claimed to live alone and the ALJ relied on this, the fact that she may not have been living alone is not relevant as far as her daily activities are concerned. In her Functional Reports plaintiff did not claim that she needed any assistance with the things she did each day.

with her daily activities. The court in <u>Singh v. Apfel</u> specifically recognized that "allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medication." <u>Id</u>. at 453. As noted above, plaintiff has had only minimal medical treatment and taken only occasional pain medication for her alleged pain. In fact, plaintiff repeatedly noted that she was not taking any pain medication or that over-the-counter Tylenol effectively controlled her occasional pain. She also reported that her pain improved with rest and stretching exercises.

Finally I note that plaintiff testified that she had applied for jobs but said no one would hire her because she has Hepatitis. The fact that plaintiff looked for work despite her Hepatitis and other impairments suggests that she did not view herself as disabled. <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995). In any event, the relevant inquiry in a disability case is whether plaintiff has the functional capacity to perform work, not whether she would actually be hired. See 20 C.F.R. § 416.967(b). A claimant will not be found disabled if his residual functional capacity makes it possible for him to work but he remains unemployed because of his inability to get a job, lack of work locally, or the hiring practices of employers. See 20 C.F.R. § 416.967(b).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not entirely credible.

## VII. *FIBROCARTILAGE TEAR*

Plaintiff argues that the ALJ erred in finding the plaintiff's fibrocartilage tear in her wrist is a non-severe impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities

24

without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe. Caviness v. Massanari, 250 F.3d 603, 604-605 (8th Cir. 2001). While severity is not an onerous requirement, it is not a "toothless standard," and claimants must show more than minimal interference with basic work activities. Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007). To be considered severe, the impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

The evidence plaintiff cites does not establish a severe impairment:

Here, the ALJ disregarded Somora's wrist impairment because she did not believe it would last twelve months and because only conservative treatment was proposed. However, Somora had reported ongoing wrist pain since mid-2009, and underwent an x-ray in December 2009, after stating that she had experienced pain for "some time." She was prescribed Ultram for the pain, but it did not get any better, and in June 2010, she underwent an MRI of her right wrist. The MRI revealed a tear in her triangular fibrocartilage with a few areas in increased T2 signal and scattered degenerative changes in the carpal bones. She continued her medications, but reported again in September 2010 that the pain was persistent and limiting her ability to fully use her right hand. While she had fairly normal range of motion, doctors noted tenderness to palpation across her wrist, and recommended a more involved, if conservative, treatment plan. She further testified at her hearing that the pain made it difficult to use her right hand. She specifically noted that it was hard for her to write since she is right-handed. The evidence and Somora's testimony show that she has more than minimal limitations resulting from her wrist impairment.

First, plaintiff's testimony about having difficulty writing is not credible. In addition to the credibility discussion above, I note that in February 2009 plaintiff completed a medical form at Concerta Medical Center and reported no decreased function in either hand. On August 28, 2009, an interview observed that plaintiff had no difficulty using her hands or writing. In October 2009 plaintiff stated in a Function Report that she is able to write letters and that she has no difficulty using her hands. In September 2010, plaintiff told Dr. Walewicz that her right wrist flares up "every once in a while" and she was taking no pain medication, not even over-the-counter pain medicine.

In September 2010 when plaintiff alleges that she "reported again" that her wrist pain was persistent and was limiting her ability to use her right hand fully, she actually rated her pain that day as a 0 on a scale of 0 to 10 (Tr. at 274) and reported only that her wrist would "pop" about once a day and that her pain had been intermittent. Dr. Low found that plaintiff had full range of motion without pain, and that she had only "mild tenderness to palpation." He was unable to reproduce the mechanical symptoms plaintiff described. Plaintiff had had no treatment at all for this condition up to this point, and Dr. Low prescribed nothing but a wrist splint. Nowhere in that medical record does plaintiff claim that she is unable to use her right hand fully, and the suggestion that Dr. Lowe recommended "a more involved" treatment

26

plan is hardly persuasive when plaintiff's treatment to that point had been nil and the "more involved" treatment plan consisted of wearing a wrist splint.

There is no credible evidence in this record, and indeed plaintiff fails to point to any, establishing that plaintiff's wrist impairment "significantly limits" her ability to perform any basic work activity.

The substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's wrist impairment is not a severe impairment.

## VIII.  RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity alleging that the ALJ relied on a single decision maker and in failing to develop the record properly regarding plaintiff's impairments.

A claimant's residual functional capacity is the most he can do despite his limitations; it is assessed based on all the relevant evidence in the case record.  20 C.F.R. § 416.945; Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  The residual functional capacity is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ has the duty to formulate the residual functional capacity based on all the relevant, credible evidence of record.  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("[t]he Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of his limitations").

Plaintiff argues that the ALJ erred in relying on a single decision-maker in assessing plaintiff's residual functional capacity, with no other medical evidence of record to address her limitations.  Indeed, the ALJ gave "significant weight" to the observations of a State agency employee who was not a medical doctor:

> The light exertion residual functional capacity is supported by a comprehensive review of the claimant's medical records. . . . The RFC found above has been based on all of the relevant evidence in the cased record, and the undersigned has considered the limitations and restrictions imposed by all of the claimant's impairments. The claimant's medical records do not support finding the claimant has any impairment that would preclude all work.
>
> The undersigned gives significant weight to the observations of DDS consultative examiner Cassandra Wiley dated November 16, 2009, as her findings are compatible with the evidence of record. She opined that the claimant can do light exertion work.

(Tr. at 17).

An opinion of a State agency non-physician examiner is not entitled to weight as a "medical opinion." See 20 C.F.R. § 416.1016(b). It does not appear, however, that the ALJ assumed that the State agency employee was a physician or regarded her observations as medical opinion evidence, but nonetheless, the ALJ did err in giving any weight at all to her assessment.

However, it is also clear that the ALJ did not rely solely on that assessment, as the ALJ specifically stated that the residual functional capacity assessment was "supported by a comprehensive review of the claimant's medical records" and was "based on all of the relevant evidence in the case record" including consideration of "the limitations and restrictions imposed by all of the claimant's impairments". The ALJ's statement that the State agency employee's findings were "compatible with the evidence of record" does not mean that the residual functional capacity assessment is based solely or largely on this person's opinion. In fact, the ALJ's residual functional capacity assessment differed from the State agency employee's assessment in several important ways: The State agency employee found that plaintiff had no postural limitations; however, the ALJ found that plaintiff could perform all postural positions only occasionally and restricted plaintiff to never climbing ropes, ladders, or scaffolds. In addition, unlike the State agency employee, the ALJ declined to include limitations related to exposure to humidity in the residual functional capacity assessment.

28

Although plaintiff argues that "there is simply no medical evidence addressing [her] RFC", the record contains nearly 200 pages of extensive medical evidence, including diagnostic testing results and treatment records from a number of physicians at Truman Medical Center, much of which the ALJ discussed in her opinion. The ALJ assessed plaintiff's residual functional capacity after careful consideration of the entire record, including medical evidence and plaintiff's subjective statements, and the ALJ specifically stated that the residual functional capacity assessment was "supported by a comprehensive review of the claimant's medical records."

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." Pearsall v. Massanari, 274 F.3d 1211, 1217-1218 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995)). The ALJ reviewed the medical records in her opinion, she reviewed plaintiff's subjective complaints as well as plaintiff's statements in her administrative documents, and she specifically stated that the residual functional capacity assessment was supported by the medical records and based on all of the relevant evidence in the case record."

Although plaintiff argues that the ALJ's residual functional capacity assessment is defective, she does not specify what, if any, additional limitations should have been included in the residual functional capacity assessment. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995)). Plaintiff has not demonstrated any specific deficiencies in the residual functional capacity assessment.

Additionally, plaintiff argues that the ALJ failed to develop the record with respect to plaintiff's functional limitations. Plaintiff contends that where there is insufficient evidence to

establish an individual's limitations "the ALJ should order a consultative exam to fully develop the record."  However, the duty to develop the record arises when a "crucial issue is undeveloped" and the evidence is not sufficient to allow the ALJ to form an opinion.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  However, there is no indication in this case that the ALJ was confused by the evidence or was unable to make a residual functional capacity assessment.  See Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005) ("there is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence.").  The fact that there is no single physician opinion outlining plaintiff's functional limitations does not mean that the residual functional capacity assessment is inadequate or that the ALJ had a further obligation to develop the record.  Steed v. Astrue, 524 F.3d 872, 875-876 (8th Cir. 2008) (substantial evidence supported ALJ's conclusion that the claimant had the RFC to perform light work, where medical records indicated that she suffered only mild degenerative changes in her back condition, even though the medical evidence "[wa]s 'silent' with regard to work-related restrictions such as the length of time she can sit, stand and walk and the amount of weight [the claimant] can carry").

Because (1) plaintiff's medical records support the ALJ's residual functional capacity assessment, (2) the record does not suggest that the ALJ relied on the State agency examiner's opinion as a medical opinion, and (3) there is sufficient evidence in the record to assess properly plaintiff's residual functional capacity, her motion for judgment on this basis will be denied.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

Case 4:11-cv-00868-REL   Document 13   Filed 01/02/13   Page 30 of 31

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 2, 2013